In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 18-1656 & 18-3366

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KEVIN LEBEAU and BRIAN BODIE,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 CR 488 — **Robert W. Gettleman**, *Judge.*

_____

ARGUED SEPTEMBER 10, 2019 — DECIDED FEBRUARY 4, 2020

_____

Before WOOD, *Chief Judge*, and KANNE and BRENNAN, *Circuit Judges*.

WOOD, *Chief Judge*. Intending to transform a failing health club into a mixed-use condominium development, Kevin LeBeau and Brian Bodie obtained a $1,925,000 loan from Amcore Bank in 2004. By the next year, unfortunately, the loan had fallen into default, and so the pair sought and obtained a forbearance agreement (later amended) from Amcore. These measures did not help either. Ultimately the

two men were indicted in 2014 on multiple counts of bank fraud and making false statements to the bank in connection with the loan and forbearance agreements. The case went to trial in 2017, and the jury convicted both LeBeau and Bodie on all counts. The court sentenced each one to 36 months' imprisonment and restitution of more than a million dollars; both have appealed.

LeBeau raises three arguments in this court: first, that the district court erred by failing to give the jury an instruction on materiality for the bank-fraud offenses; second, that the court should not have admitted evidence related to certain victims' losses in the scheme and their status as prior victims of fraud; and finally, that he received ineffective assistance of counsel at the sentencing stage, where his lawyer failed to challenge the amount of restitution. Bodie contends that his conviction must be thrown out because the superseding indictment was time-barred. He also disputes the sufficiency of the evidence to convict him. Finding no prejudicial error in any of these respects, we affirm the district court's final judgments.

## I

### A

At trial, the jury learned that Kevin LeBeau owned and operated a health club located on approximately ten acres of land he owned in Aurora, Illinois. Around 2004, the business ran into difficulties, prompting LeBeau to team up with Brian Bodie to redevelop the land as a condominium project. Bodie was an attractive partner because he ran two mortgage companies, PreStar Financial Corp. and Mortgage Desk. The two submitted a loan application to Amcore Bank, a federally insured financial institution, in May 2004, and the bank gave

them a $1,925,000 mortgage loan in September 2004. LeBeau and Bodie executed full personal guarantees on the loan and listed Bodie's two companies as guarantors.

As the borrower, LeBeau was required to submit truthful and complete personal financial statements to the bank. But from the start, he did not do so. LeBeau failed to disclose more than $130,000 in outstanding personal loans in his initial personal financial statement, which he submitted in September 2004; he repeated the omission in a second statement submitted in May 2005.

It did not take long for LeBeau and Bodie to fall behind on the Amcore loan. By late 2005 they were in discussions with a bank representative about how to proceed. Raising the stakes, the bank issued a demand letter in March 2006. In response, LeBeau and Bodie paid $151,000 toward the balance of the loan—a step that convinced the bank to delay further action at that time. In July 2006 Bodie sent a letter to Amcore requesting a forbearance agreement for the defaulted loan. In that letter, Bodie represented that he and LeBeau had begun the formal process to obtain rezoning and development permissions from the city. This was false: in fact, they had only informally discussed this possibility with city officials.

Amcore filed a foreclosure complaint in state court in August 2006. For the next several months, discussions among the defendants, along with their attorney, Robert Schlyer, about a possible forbearance agreement took place. LeBeau and Bodie offered to make payments toward the loan principal and interest, and they represented that they had external investors committed to the project.

In January 2007 Amcore agreed to enter into a two-month forbearance agreement on the condition that LeBeau and Bodie make a $150,000 payment. LeBeau obtained the money for the payment by securing a $300,000 investment in the development project from Delores and Kenneth Palmquist. He represented to the Palmquists that the condominium development would be worth at least $6 million and that they would receive 14% annual interest on the principal as well as an interest in the underlying land. But he did not inform the Palmquists that he and Bodie were in default on the project loan and that Amcore had initiated foreclosure proceedings. Nor did he disclose to Amcore that he obtained the money for the forbearance fee by granting the Palmquists an interest in the mortgaged property without the bank's authorization.

Matters were no better for LeBeau and Bodie by March 2007: they were still unable to fulfill their obligations under the loan, and so they sought an amended forbearance agreement from the bank. In April, Schlyer sent materials to Amcore indicating that the defendants had assembled a development team, the zoning phase of the project would be completed by June 2007, development was underway on the parcel, and there were three subscribers ready to invest $1.5 million in the development company. None of these representations was true. They had the desired effect, however, when Amcore agreed to enter an amended forbearance agreement in May 2007.

In the end, LeBeau and Bodie made no further payments on the Amcore loan and development never commenced on the parcel. Amcore took ownership of the property in 2009 af-

ter a sheriff's sale, and it was ultimately sold by Amcore's successor, BMO Harris, for $375,000. None of the individual investors recouped their investment principal.

B

On August 28, 2014, a grand jury returned a nine-count indictment charging LeBeau and Bodie with bank fraud in violation of 18 U.S.C. § 1344(1) and (2), and making false statements in violation of 18 U.S.C. § 1014. (Schlyer was separately charged and tried by a jury in the Northern District of Illinois for his role in the scheme. He was convicted on two counts of wire fraud affecting a financial institution, 18 U.S.C. § 1343, and one count of bank fraud, 18 U.S.C. § 1344. 17-CR-30 (N.D. Ill.)). On June 29, 2016, the grand jury returned an eight-count superseding indictment. The superseding indictment eliminated two of the false-statement counts and associated allegations against Bodie, reorganized some of the counts, added more recent conduct that indisputably fell within the statute of limitations, and amended the section 1344 counts to allege violations of only section 1344(1). It charged LeBeau with three counts of bank fraud, in violation of section 1344(1), and four counts of making false statements to the bank, in violation of section 1014; Bodie was charged with three counts of bank fraud and three false-statement counts.

In March 2017, after a week-and-a-half long trial, the case was submitted to a jury. The district court instructed the jury that in order to carry its burden on the section 1344(1) counts, the government had to establish that (1) there was a scheme to defraud a bank, (2) the defendants knowingly executed or attempted to execute the scheme, (3) the defendants acted with the intent to defraud, and (4) at the time of the charged

offense the deposits of the bank were insured by the Federal Deposit Insurance Corporation. The instruction did not state that the government was required to prove the "scheme involved a materially false or fraudulent pretense, representation, or promise …," as recommended in the Seventh Circuit Pattern Criminal Jury Instructions. See Pattern Criminal Jury Instructions of the Seventh Circuit (2012 Ed.) (plus 2015–2017 and 2018 changes), http://www.ca7.uscourts.gov/pattern-jury-instructions/7th_criminal_jury_instr.pdf ("Pattern Instr."), at 447. As noted earlier, the jury convicted both defendants on all counts, and both received sentences of 36 months in prison, two years of supervised release, and restitution in the amount of $1,016,000.

## II

### A

We begin with LeBeau's challenge to the jury instructions for the bank-fraud counts. The statute prohibiting bank fraud, 18 U.S.C. § 1344, has two parts. Section 1344(1) states that "Whoever knowingly executes, or attempts to execute, a scheme or artifice—(1) to defraud a financial institution … shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both." Subpart (2) prohibits a scheme or artifice "to obtain any of the moneys, … or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." § 1344(2). Counts One, Two, and Three of the superseding indictment (the only ones that referred to section 1344) all accused the defendants of offenses under section 1344(1): "knowingly participat[ing] in a scheme to defraud a financial institution," Count One, ¶¶ 2, 11, or "knowingly execut[ing] and attempting to execute the above-

described scheme," Count Two, ¶ 2, Count Three, ¶ 2. The only false statements charged in the indictment appear in Counts Four through Eight, all of which refer only to 18 U.S.C. § 1014.

When discussing the proposed jury instruction for the section 1344 counts prior to trial, the government stated that because it had not brought charges under section 1344(2), materiality was not an element and there was no need for an instruction on it. The district court said, "I assume the defendants agree to that?" Bodie's counsel responded, "I agree to it," and LeBeau's counsel responded, "Yes, Judge."

The district court instructed the jury on the elements of section 1344 as follows:

> 1)     There was a scheme to defraud a bank, as described in Counts One, Two, and Three of the indictment; and
>
> 2)     The defendant knowingly executed or attempted to execute the scheme; and
>
> 3)     The defendant acted with the intent to defraud; and
>
> 4)     At the time of the charged offense the deposits of the bank were insured by the Federal Deposit Insurance Corporation.

This instruction mirrors the Pattern Instructions, with the key exception that it does not ask the jury to decide whether "the scheme involved a materially false or fraudulent pretense, representation, or promise." See Pattern Instr. at 447. LeBeau asserts that this omission impermissibly relieved the

government of part of its evidentiary burden and prejudiced him.

LeBeau's point is a serious one, supported by Supreme Court precedent and some of our decisions. In *United States v. Neder*, 527 U.S. 1 (1999), the Supreme Court held that "materiality of falsehood is an element of the federal … bank fraud statute[]." *Id.* at 25. It did not limit that holding to section 1344(2). Rather, it determined that "fraud" itself requires the element of materiality. *Id.* at 23. We have since said that *Neder* requires "district courts [to] include materiality in the jury instructions for section 1344." *United States v. Reynolds*, 189 F.3d 521, 525 n.2 (7th Cir. 1999). The Committee Comment to the Pattern Instruction for section 1344 is even more explicit:

> Although the Seventh Circuit has not yet addressed the application of *Neder* to § 1344(1) specifically, the Ninth Circuit, in *United States v. Omer*, 395 F.3d 1087 (9th Cir. 2005), held that materiality is an element of a § 1344(1) violation under *Neder*. In light of the general admonitions in *Neder* and *Reynolds*, this instruction has been modified to reflect this requirement.

Pattern Instr. at 448.

On the other hand, we have not consistently followed this guidance. Recently we stated that to prove bank fraud under section 1344(1), the government needs to prove only the four elements contained in the jury instruction in this case. *United States v. Ajayi*, 808 F.3d 1113, 1119 (7th Cir. 2015). The additional materiality element, we said, was required only when section 1344(2) was charged. *Id.*

The better course, consistent with *Neder*, is to require the materiality instruction on all bank-fraud charges, whether

brought under section 1344(1) or (2). The government has informed us that this is its current practice, and we encourage that practice to continue until such time as we receive greater clarity from the Supreme Court about what is required.

The question whether the court's omission of the materiality element in LeBeau's case requires reversal does not, however, turn on whether the court erred in this respect. It turns instead on the fact that LeBeau's counsel affirmatively consented before trial to the instruction without the materiality element, and counsel never withdrew that position.

If a defendant negligently bypasses an opportunity to challenge a jury instruction—*i.e.* he forfeits it—he may nevertheless later attack that instruction for plain error. FED. R. CRIM. P. 30(d) and 52(b). "However, a defendant who waives—rather than forfeits—his objection cannot avail himself of even the demanding plain error standard of review." *United States v. Natale*, 719 F.3d 719, 729 (7th Cir. 2013). "Although passive silence with regard to a jury instruction permits plain error review … a defendant's affirmative approval of a proposed instruction results in waiver." *Id.* We have "strictly applied this rule to affirmative expressions of approval without examining whether the statements were a 'knowing and intentional decision' or resulted from 'negligently bypassing a valid argument.'" *Id.* "As a result, affirmative statements as simple as 'no objection' or 'no problem' when asked about the acceptability of a proposed instruction have resulted in waiver." *Id.* at 730.

LeBeau argues that his counsel did not affirmatively approve the court's instructions and that the interests of justice require us to overlook any waiver that occurred. The first point finds no support in the record. The judge could not have

been more direct. After the government explained why it was not proposing a materiality instruction, the judge said "I assume the defendants agree to" an elements instruction that omitted materiality, and LeBeau's counsel said "Yes, Judge." That can only be read as direct acquiescence in the proposed instruction. Moreover, because this discussion took place in pretrial proceedings, counsel had the opportunity to confirm what the government said and to raise a later objection to the instruction at any time before the case went to the jury. But he did not. He therefore waived the argument.

LeBeau's second argument—that we can overlook a genuine waiver—fails to grapple with the nature of a true waiver. In *United States v. Olano*, 507 U.S. 725 (1993), the Supreme Court said that when a defendant has waived a right (that is, has intentionally relinquished or abandoned a known right, see *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)), that right has been extinguished. 507 U.S. at 733. See *United States v. Waldrip*, 859 F.3d 446, 449 (7th Cir. 2017). This is not to say that the *characterization* of the defendant's action is not critical. At times, there may be some ambiguity in the defendant's statement, and so the court must decide whether it is looking at waiver or the type of negligent oversight that triggers plain-error review. See *Natale*, 719 F.3d at 729–30. In this case, however, we see no such ambiguity. We note as well that we speculated in *Natale* that waiver might not be "an absolute bar on our consideration of issues not preserved below" and that "[w]hen the 'interests of justice' so require, we may reach the merits of a waived issue." *Id.* at 731 (citing *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 608 (7th Cir. 2012)). But this was *dicta*.

Such an exception to the ban on review of waived issues would be difficult to square with the Supreme Court's

teachings, but we need not pursue this possibility any further in LeBeau's case. First, the waiver is clear. Second, even if we thought it was ambiguous enough to support plain-error review, the omission of the materiality element from LeBeau's jury instruction did not affect his substantial rights, *Olano*, 507 U.S. at 732; in fact, it is hard to imagine a jury that would not have found LeBeau's stories to Amcore to be material, meaning "capable of influencing the decision of the person to whom it was addressed." See Pattern Instr., 18 U.S.C. §§ 1341 & 1343 Definition of Material, at 431 (cross-referenced in Comment to § 1344(1) at 448). LeBeau candidly acknowledges that the jury instructions given in *Neder* and *Reynolds* were found to be sufficient or at worst harmless error despite omitting a required element. The same is true here. The district court could reasonably have determined that the term 'fraud' "embodies the concept of materiality," and that the instructions as given "adequately place[d] the question of materiality before the jury." *United States v. Pribble*, 127 F.3d 583, 589 (7th Cir. 1997); see also *United States v. Fernandez*, 282 F.3d 500, 509 (7th Cir. 2002) (finding in the health-services fraud context that omission of an explicit reference to materiality in the jury instruction was not plain error because the instructions viewed in their entirety adequately embraced the concept of materiality).

LeBeau waived any argument he might have presented about the need to include a separate materiality instruction on the charges under section 1344(1) when he affirmatively consented to proposed language. Moreover, even if he merely forfeited this point, any possible error did not affect his substantial rights.

B

We next consider LeBeau's assertion that the district court erred by allowing the government to introduce evidence of Amcore's and various investors' losses as a result of the fraudulent scheme. LeBeau did not object to this evidence at trial, and so our review is only for plain error. See *United States v. Thomas*, 933 F.3d 685, 690 (7th Cir. 2019); FED. R. CRIM. P. 52(b). "On plain-error review, we may reverse if: (1) an error occurred, (2) the error was plain, (3) it affected the defendant's substantial rights, and (4) it seriously affected the fairness, integrity, or public reputation of the proceedings." *Thomas*, 933 F.3d at 690. "Plain error will be found only when the exclusion of the erroneously admitted evidence probably would have resulted in an acquittal." *United States v. Rangel*, 350 F.3d 648, 650 (7th Cir. 2003).

At trial, the government introduced evidence showing that Amcore's successor eventually foreclosed on the property and recouped only $375,000—far less than the remaining balance on the loan—in a sheriff's sale. The jury also heard evidence that individual investors lost the principal they had ploughed into the supposed condominium project. Others who had made personal loans to LeBeau were never repaid. One investor, Janice Pace, testified about having previously been a victim of an unrelated investment fraud and about how the defendants pitched investment in their development as a way for the Paces to recover from their previous losses.

LeBeau argues that "pecuniary loss is not an element of a fraud charge that the government is required to prove in order to sustain a conviction." This evidence, he says, amounts to "victim impact testimony" that should have been excluded

under Federal Rule of Evidence 403, as it has little or no pro-
bative value and is highly prejudicial. The government re-
sponds that the evidence was relevant because it showed the
scope and methods of the fraudulent scheme and helped to
"establish defendants' *mens rea*, including knowledge that
their efforts to avoid payment and delay foreclosure could
cause substantial risk of loss." The government also argues
that the evidence of LeBeau's outstanding debt was admissi-
ble for the purpose of supporting the charge that the personal
financial statements he filed with Amcore in order to obtain
the development loan were false.

Because LeBeau did not object at trial to introduction of
any of this evidence, the district court did not have a chance
to exercise its discretion. As a result, LeBeau "must essentially
show that the evidence was so obviously and egregiously
prejudicial that the trial court should have excluded it even
without any request from the defense, and that no reasonable
person could argue for its admissibility." *United States v.
LeShore*, 543 F.3d 935, 939 (7th Cir. 2008).

LeBeau has not met this demanding standard. Even if ev-
idence of pecuniary losses was unnecessary given the amount
of other evidence produced at trial supporting the jury's ver-
dict, we cannot say that LeBeau probably would have been
acquitted but for this contested evidence.

C

Finally, LeBeau argues that the court erred in calculating
restitution. Once again, this is a new argument on appeal.
This time he asserts that his sentencing counsel's failure to
make a proper objection amounted to ineffective assistance of

counsel in violation of his Sixth Amendment rights. We generally discourage raising this argument on direct appeal, since the record so often sheds no light on counsel's thinking. LeBeau has insisted, however, that he wishes to press it, and so (with the reminder that he will not be able to raise an ineffectiveness claim again in a motion under 28 U.S.C. § 2255) we will examine it.

In his sentencing memorandum, LeBeau agreed to a total loss figure of $1,016,000—$789,000 to Amcore and $227,000 to the Palmquists. This is the precise amount that the district court ordered as restitution. The question for us is whether counsel's failure to, or decision not to, object to that amount fell below the minimum acceptable performance level and was so prejudicial to LeBeau that his Sixth Amendment rights were violated. See *Strickland v. Washington*, 466 U.S. 668, 687 (1984). For counsel's performance to be deficient, he must have "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*

LeBeau argues that his counsel should have objected to the inclusion of Amcore's losses because Amcore was not properly categorized as a victim entitled to restitution under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A. This is so, LeBeau asserts, because Amcore was reckless in loaning money to the defendants and entering into a forbearance agreement with them. He reasons that the bank's loss should therefore be deemed the result of its own recklessness rather than the defendants' misconduct. For support he turns to our decision in *United States v. Litos*, 847 F.3d 906 (7th Cir. 2017). In *Litos*, we reversed an order of restitution to Bank of America because the bank did not "have clean hands" and

acted recklessly by "clos[ing] its eyes" to phony loan applications and questionable claims about the solvency of the mortgagors involved. *Id.* at 907–10.

LeBeau contends that Amcore was equally reckless here because it knew that LeBeau and Bodie were in dire financial straits and ignored the advice of its own lawyers when it entered into the forbearance agreements. He also notes that the district court in Schlyer's trial was troubled by Amcore's lack of diligence and accordingly declined to order restitution to the bank. LeBeau presumes that if his sentencing counsel had raised the same argument Schlyer's counsel made, the district court in his case would have reached the same conclusion.

But one district court's conclusion is not binding on another. LeBeau provides no support for his assumption that additional argument would have prompted the district court here to follow the example of its colleague in *Schlyer*. We add that *Litos* is readily distinguishable. There we found that the loan applications were "a joke on their face" and showed clear signs of being phony. That was not the case here. There were certainly indications that the defendants were struggling—that was why they needed a forbearance agreement. But part of the defendants' fraudulent scheme involved raising significant funds to pay the bank in exchange for the forbearance agreements. Those payments misled Amcore into believing that the risk was manageable. Each time the defendants paid what the bank demanded, even though they did so by committing fraud on others. Whether the bank was reckless is debatable and it is not certain what the district court would have decided had the defendants timely raised the argument.

Nothing on this record raises a reasonable probability that LeBeau's counsel would have succeeded with an attack on the

restitution order. We see neither deficient performance nor prejudice, and so we find no violation of his Sixth Amendment right to counsel.

### III

We now move on to the two claims Bodie raises on appeal: (1) the timeliness and validity of the superseding indictment, and (2) the sufficiency of the evidence to convict him on all counts.

### A

Bodie did not raise a statute of limitations defense in the district court. While this omission does not result in waiver, see FED. R. CRIM. P. 12(b), it does result in forfeiture, see *United States v. Ross*, 77 F.3d 1525, 1536 (7th Cir. 1996). Accordingly, we review whether the superseding indictment is time-barred only for plain error. FED. R. CRIM. P. 52(b).

The superseding indictment, which is the one on which Bodie focuses, was filed on June 29, 2016. The limitations period for the crimes charged is ten years. 18 U.S.C. § 3293(1). The superseding indictment charged Bodie with violations of section 1344 stemming from conduct in January and May 2007, and with violations of section 1014 stemming from conduct in July 2006 and April 2007. All conduct charged occurred within the ten-year period extending backward from June 29, 2016. On its face, therefore, the superseding indictment against Bodie was not untimely.

Bodie argues nonetheless that the superseding indictment materially broadened the original charges, preventing it from 'relating back' to the original indictment (which had been returned on August 28, 2014) and leaving it time-barred. But the relation-back doctrine merely allows a superseding

indictment charging conduct now outside the statute of limitations to supplant a "still-pending original indictment … so long as it neither materially broadens nor substantially amends the charges initially brought against the defendant." *Ross*, 77 F.3d at 1537. The doctrine does not bar the government from charging new conduct that is independently within the limitations period set by the new indictment. Because all charges against Bodie in the superseding indictment were timely, it does not matter if they were materially different from those in the original indictment.

The only conduct charged in the superseding indictment that fell outside of the ten-year period was *LeBeau*'s submission of false personal financial statements. This conduct was also charged in the original indictment, however, and so there is no relation-back problem. In any event, LeBeau did not challenge the superseding indictment. Accordingly, Bodie's challenge to the timeliness of the superseding indictment is without merit.

## B

Last, Bodie contests the sufficiency of the evidence to convict him. Bodie's charges stem from the defendants' efforts to obtain the original and amended forbearance agreements from Amcore Bank in January and May 2007.

"In reviewing the sufficiency of the evidence, we review the evidence in the light most favorable to the government, and we will overturn a jury verdict only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Garten*, 777 F.3d

392, 400 (7th Cir. 2015). This is a "heavy burden" for the defendant. *United States v. Brandt*, 546 F.3d 912, 915 (7th Cir. 2008). We will not re-weigh the evidence or "second-guess the jury's credibility determinations." *United States v. Coscia*, 866 F.3d 782, 795 (7th Cir. 2017).

Recall that Counts 1–3 are for bank fraud under 18 U.S.C. § 1344(1), which criminalizes "knowingly execut[ing], or attempt[ing] to execute, a scheme or artifice—(1) to defraud a financial institution… ." Count 1 charges a scheme to defraud with the original forbearance agreement as the execution. The false statements discussed in Count 6, along with other evidence, support this charge. Count 2 charges a scheme to defraud with the deposit of the Palmquists' money as the execution. The record shows that the defendants fraudulently obtained a $300,000 investment from Delores and Kenneth Palmquist in exchange for a purported interest in the property, and they used $150,000 of it as consideration for the original forbearance agreement with the bank. Personnel from the bank testified that this payment was a critical factor in the bank's willingness to enter into a forbearance agreement and that they did not know where the money came from. Count 3 charges a scheme to defraud with the amended forbearance agreement as the execution. The false statements discussed in Counts 6 and 7 support this charge.

Counts 6–8 are for false statements in violation of section 1014, which criminalizes "knowingly mak[ing] any false statement or report … for the purpose of influencing in any way the action of … any institution the accounts of which are insured by the Federal Deposit Insurance Corporation… ."

On Count 6, the government introduced into evidence a letter Bodie sent to Amcore Bank on July 21, 2006, requesting

a forbearance agreement on the defaulted loan he and LeBeau previously obtained from the bank. In the letter, Bodie indicated that he and LeBeau, working with a local developer, had begun the formal re-zoning process with the city:

> We are in the first phase of a three-stage process and have had conversation [*sic*] with the aldermen and the city planner for the City of Aurora. … We expect to have zoning approval by year end, at which time we will refinance the loan with another financial institution. I hope these terms meet with your approval, as we are confident our zoning request will meet with approval by the City of Aurora.

At trial the city's director of economic development and its director of zoning each testified that this letter misrepresented what was happening. They stated that the formal process for requesting re-zoning had not begun as of the time Bodie and LeBeau obtained the forbearance agreement.

On Count 7, the government introduced evidence that on April 4, 2007, LeBeau and Bodie's lawyer, Schlyer, sent the bank materials falsely purporting to show that development was underway on the health club site and that LeBeau and Bodie had secured subscription agreements from three investors totaling $1.5 million. Bodie hired someone to produce these documents. The evidence at the trial, however, indicated that LeBeau and Bodie knew that the materials were misleading, yet they either told Schlyer to send them to the bank, or at least they knew he was doing so.

Evidence before the jury also supported the charges in Count 8. It learned that on April 23, 2007, Schlyer sent the

bank a letter and other materials representing that the defendants had formalized an investment mechanism for the development, that the subscription agreements were genuine, that they had assembled a development team, and that they expected zoning to be complete by June 2007. These materials supported the defendants' request for an amended forbearance agreement, which the bank granted on May 8, 2007. Bodie signed this agreement.

Bodie disputes his knowledge of both of Schlyer's April 2007 communications with the bank and asserts that he was not involved in the negotiation of the original and amended forbearance agreements after July 2006. But the jury was not obliged to believe his testimony, and in fact did not.

It was rational for the jury to conclude that the evidence established beyond a reasonable doubt that Bodie knowingly and intentionally made, and caused others to make, false representations to Amcore about the status of the development in order to obtain the forbearance agreements. We therefore reject his contention that the evidence was insufficient to support the jury's verdict.

## IV

We AFFIRM the district court's final judgments in both of these appeals.